Rodney L. WOLFF, Appellant,

v.

ARCTIC BOWL, INC., a corporation, et al., Appellees.

No. 1380.

Supreme Court of Alaska.

Feb. 16, 1977.

---

Clem H. Stephenson, Fairbanks, for appellant.

Albert Maffei, Anchorage, for appellees.

Before BOOCHEVER, C. J., and RABINOWITZ and CONNOR, JJ.

## OPINION

CONNOR, Justice.

This appeal concerns a shareholder's suit brought against Arctic Bowl, Inc., its directors and its shareholders by Rodney Wolff, a minority shareholder, for alleged fraudulent misconduct by the directors and officers of the corporation.

In 1958 Arctic Bowl, Inc. (Bowl) was formed by appellant Wolff and others for the purpose of developing and operating a bowling center in Fairbanks. At that time Alaska Overland, Inc. (Overland) had an interest in an airline hangar located at Weeks Field which it was thought could be converted to a bowling alley. In order to raise money to obtain a complete interest in the hangar, and to finance its remodeling, Bowl stock was offered to the public. On May 19, 1958, 12 stock certificates in Bowl were issued for 216 shares at a par value of $100.00. Certificate No. 1 was issued to Rodney Wolff for 50 shares. The incorporators of Bowl encountered difficulty in selling the stock and obtaining loans to complete the remodeling. At about this time, Paul Sandifur, the President of Metropolitan Mortgage and Securities Company, Inc. (Metropolitan), a Washington corporation, contacted Victor Hart and told him Metropolitan would be interested in financing the remodeling of the hangar.

As a condition of financing Metropolitan required that all of the original owners of the stock certificates of Bowl endorse their certificates and return them so that Metropolitan would have a controlling interest in Bowl. Although the other original shareholders complied, Wolff elected to remain a shareholder. He alleges he did, however, turn in his certificate with the understanding that he would be reissued the same number of shares on a form satisfactory to Metropolitan. It is unclear when Wolff actually turned in his certificate. The back of the certificate indicates and Wolff testified that it was transferred to Overland on August 8, 1958. Victor Hart testified that Metropolitan did not even enter the picture until 1959, though the back of another shareholder's certificate has an August 25, 1958 date on it. In any event, Wolff apparently turned his certificate in and was reissued a certificate in 1959 for only ten shares.

In March of 1959 a Bowl shareholders meeting was held at which officers and directors were purportedly elected. Appellant Wolff challenges the validity of this election. At this time, Metropolitan and Overland entered into an agreement which was supplemented by a later agreement in April of 1959. In this later agreement, Overland gave Metropolitan a 52% interest in Bowl. The terms of this agreement were then reiterated in a September 20, 1959, agreement which provided that Metropolitan would improve the airline hangar and sell it to Arctic Bowl for its cost plus 25%. The purchase price, based on construction costs, was to be $575,000 with $52,000 as a down payment.

Approximately one year later, the cost of a shopping center, which was located on the property contiguous to the bowling alley, was added to the existing balance due on the bowling alley. The total purchase price was $878,773.77.

The bowling alley was leased by defendant Victor Hart who subsequently filed a petition in bankruptcy. Bowl suffered fi-

nancial losses[1] and in 1961, Charles H. Sandifur, Vice President of Metropolitan, advised the shareholders, directors and officers of Bowl that the corporation was insolvent and in danger of suffering a forfeiture on the contract of purchase.

The instant suit was filed in 1971. Wolff, who had managed the bowling alley for approximately one year, alleged that Hart fraudulently converted the 40 shares of stock which were not reissued to him and that he had been unable to inspect the books and records of Bowl. He requested that the interest of the defendants and their stock be cancelled and set aside. He contended that none of the other appellees paid for their stock, and that he was the only stockholder of the corporation. He further alleged that all of the defendants fraudulently manipulated the books of the corporation.

After a trial without a jury, the trial court found for the defendants. Judge Burke concluded that Wolff failed to sustain his burden of proof with respect to the transfer of stock to Bowl and the inflation of construction costs. He held that Wolff was barred from relief by laches. However, he did conclude that Wolff was entitled to the return of the 40 additional shares of stock.

On June 17, 1974; Wolff moved for a new trial under Alaska Rule of Civil Procedure 60 on the basis of newly discovered evidence. The newly discovered evidence was that on March 14, 1973, the Grand Jury at Fairbanks, Alaska, returned an indictment against appellee C. Paul Sandifur, charging him with perjury in his testimony in the instant case. Sandifur later pleaded guilty to the reduced charge of wilfully concealing evidence. Based on this, Judge Burke granted a new trial. Upon reviewing the

case and Sandifur's conviction, Judge Burke vacated his order granting a new trial.

Appellant Wolff raises five issues on appeal:

1. Whether the trial court erred in vacating the order granting the new trial because that order had become the law of the case;

2. Whether the trial court erred in finding that the original stock issued by Bowl was purchased by Overland and that Overland was the owner of this stock;

3. Whether the findings of fact and conclusions of law that Wolff, as plaintiff, did not sustain his burden of proving fraudulent inflation of construction costs are erroneous;

4. Whether the trial court erred in finding appellant guilty of laches with respect to bringing issues (2) and (3), above, before the court; and

5. Whether the trial court should have rendered a judgment for appellant for an accounting and examination and inspection of books, records and accounts of Bowl.

The trial court's conclusions of law were not based solely on the affirmative defense of laches, but also dealt with the substantive issues raised by the parties. Even if the trial court committed error in finding laches, we must affirm its judgment unless it erred with respect to the other findings of fact or conclusions of law as well.

I

■ Judge Burke entered an order granting plaintiff's motion for new trial on October 3, 1974. Defendants filed a petition for review of that order, which we denied. On May 30, 1975 Judge Burke vacated his earlier order sua sponte, having

---

1. Apparently, the bowling alley had never been profitable, and Metropolitan was continually putting money into it to avoid insolvency.

Judge Burke found:

"[T]hat throughout a large part of its existence, Arctic Bowl, Inc. was in severe financial distress and in order to relieve the distress, Metropolitan Mortgage and Securities Company, Inc. and the remaining defendants entered into a variety of agreements and transfer of assets and obligations in order to avoid insolvency for Arctic Bowl, Inc. and the Court cannot find from the proof submitted that these actions were improper. This finding is not challenged on appeal.

decided that he was mistaken in ordering a new trial.[2]

Plaintiff asserts that the original order granting a new trial "became the 'law of the case' when defendants' petition for review was denied," and hence the order could not be vacated.

■ The doctrine of the law of the case prohibits the reconsideration of issues which have been adjudicated in a previous appeal in the same case. *Patrick v. Sedwick*, 413 P.2d 169, 173 (Alaska 1966). *See also Watts v. Seward School Board*, 421 P.2d 586, 618 (Alaska 1966) (Rabinowitz, J., concurring in part and dissenting in part), *rehg. denied*, 423 P.2d 678 (Alaska 1967), *vacated* 391 U.S. 592, 88 S.Ct. 1753, 20 L.Ed.2d 842 (1968), *reinstated*, 454 P.2d 732 (Alaska 1969), *cert. denied*, 397 U.S. 921, 90 S.Ct. 899, 25 L.Ed.2d 101 (1970). Even issues not explicitly discussed in the first appellate opinion, but directly involved[3] with or "necessarily inhering"[4] in the decision will be considered the law of the case. This doctrine is akin to the doctrine of *res judicata*,[5] in that it requires that a final judgment be rendered with respect to the issues at hand. *See United States v. United States Smelting Refining & Mining Co.*, 339 U.S. 186, 199, 70 S.Ct. 537, 94 L.Ed. 750 (1950).

■ A denial of a petition for review does not constitute a determination of the issue in a case nor is it a final judgment for the purposes of *res judicata*. A petition will be denied where the issue is simply not important or urgent enough to warrant a departure from the usual appellate procedure. The petitioner is not foreclosed by such denial in bringing up the issue later in an appeal, since there has been no determination of the merits of the issue. *See* Alaska R.App.Proc. 24(a);[6] *Contento v. Alaska State Housing Authority*, 398 P.2d 1000 (Alaska 1965).

■ Therefore, we hold that the trial court was not bound by the law of the case when it originally granted the new trial.

## II

Wolff contends that the trial court erred in finding that the original stock issued by Arctic Bowl, Inc. was purchased by Alaska Overland, Inc. and paid for with its money and that Alaska Overland, Inc. was the owner of the stock. Wolff claims the trial court's finding is contrary to and is not supported by the evidence. He alleges that

2. Civil Rule 59, which provides for the granting of a new trial, does not indicate under what circumstances an order granting a new trial may later be vacated. Courts interpreting Federal Rule of Civil Procedure 59, which is identical in relevant particulars, have observed that an order granting a new trial is interlocutory, not final. It leaves the case and the parties before the court. Therefore, it may be reconsidered and set aside at a later time. *Bateman v. Donovan*, 131 F.2d 759, 764 (9th Cir. 1942); 6A J. Moore, Moore's Federal Practice ¶ 59.-13[2] (1974).

We recognize that Rule 59(e) limits the sua sponte granting of a new trial to a 10-day period following entry of judgment. An order granting a new trial destroys the finality of what would otherwise by a final and appealable judgment. However, an order vacating a previous grant of a new trial has no similar effect, so there is no analogous reason to require that it be made within the 10-day period.

3. *Morehouse v. City of Everett*, 141 Wash. 399, 252 P. 157, 158 (Wash.1926).

4. *Perrault v. Emporium Department Store Co.*, 83 Wash. 578, 145 P. 438, 439 (Wash.1915).

5. It is distinguishable from the doctrine of *res judicata* in that it operates only in the particular case and only as a rule of policy, not of law. 5 Am.Jur.2d Appeal & Error § 744 (1962).

6. Alaska R.App.Proc. 24(a) provides:

"(a) *When Granted.* A review is not a matter of right, but will be granted only: (1) where the order or decision sought to be reviewed is of such substance and importance as to justify deviation from the normal appellate procedure by way of appeal and to require the immediate attention of this court; or (2) where the sound policy behind the general rule of requiring appeals to be taken only from final judgments is outweighed by the claim of the individual case that justice demands a present and immediate review of a particular nonappealable order or decision; or (3) where the superior court has so far departed from the accepted and usual course of judicial proceedings, or so far sanctioned such a departure by an inferior court or administrative tribunal, as to call for this court's power of supervision and review."

he was the only owner of Bowl stock on March 19, 1959 and, therefore, that the purported election of Victor Hart, C. Paul Sandifur and Charles H. Sandifur as officers of Bowl was illegal.

■■ The defendants maintain that the endorsements on the back of the stock certificates to Overland as assignee constitute prima facie evidence that Overland was the actual transferee and true owner of the stock. Judge Burke found that Wolff had not received his new certificate at the time of the March 1959 meeting, and therefore Overland, as assignee was the only shareholder at that time. However, the secretary of Metropolitan, Howard Frissel, testified that the certificates were not actually signed over to Overland until after the March, 1959 meeting. According to the tes-

timony of Mr. Patton, one of the incorporators of Bowl, stock was not issued to Overland until September of 1959, at which time Overland was issued 220 shares. Judge Burke concluded that:

> "[S]ince Alaska Overland, Inc. apparently used its own funds to repurchase the shares of the original investors except plaintiff's shares, therefore, on March 19, 1959 at such meeting, Alaska Overland, Inc. was the equitable owner of such shares and that despite the failure to comply with the technical requirements of the corporation's bylaws, equitable principles require that the election of officers and their decision to issue stock be upheld except as to their decision to issue plaintiff a certificate for 10 shares rather than 50 shares." [7]

7. The other pertinent findings on this issue are as follows:

> "XXXVII
>
> That the plaintiff has failed to sustain the burden of proof that the meeting of March 19, 1959 was illegally held and that the persons who appeared and cast votes for the officers and directors were not shareholders of Arctic Bowl, Inc. That the bylaws of Arctic Bowl, Inc., do provide that the corporation shall not recognize a transferee as the owner entitled to vote until the transfer is entered on the books of the corporation, which did not occur until September of 1959.
>
> "XII
>
> That all of the original shareholders endorsed their stock certificates and they were transferred to Alaska Overland, Inc.; and all except plaintiff Rodney L. Wolff were paid the amount for which they had purchased such shares. That from the evidence it appears that Alaska Overland provided the funds used to repurchase such shares of stock.
>
> "XVII
>
> That at this time (March 19, 1959) the records indicate that Alaska Overland, Inc. was apparently the assignee of the shares of the original stockholders and the only actual holder of shares of stock of record since the transfer of the stock had not been made on the books of Arctic Bowl, Inc. at that date.
>
> "XXI
>
> That the stock certificates were not actually issued until September 1, 1959, at which time the following shares were issued: Certificate No. 25 to Metropolitan Mortgage, 520 shares; Certificate No. 26 to Rodney L. Wolff, 10 shares; Certificate No. 27 to Bud F. Meyers, 30 shares; Certificate No. 28 to Alaska Over-

land, 220 shares; Certificate No. 29 to Victor Hart, 220 shares.

We note Judge Burke also found that the officers were de facto officers of Bowl. A de facto officer or director is "one who is in possession of an office under claim and color of an election or appointment, and continuously exercising its functions and discharging its duties." W. Fletcher, Cyclopedia of the Law of Private Corporations § 374 (rev. perm. ed. 1969); *see, e.g., Independence Lead Mines Co. v. Kingsbury,* 175 F.2d 983 (9th Cir.), *cert. denied* 338 U.S. 900, 70 S.Ct. 249, 94 L.Ed. 554 (1949); *John Paul Lumber Co. v. Agnew,* 125 Cal.App.2d 613, 270 P.2d 1044, 1048 (1954); *cf., In re Bankers Trust,* 403 F.2d 16 (7th Cir. 1968) (de facto bank trustees); *Watson v. Watson,* 24 P.2d 592, 594 (Wash.1933) (board of directors found to be de facto officers of savings and loan association though lacking financial interest required by statute). Acts of de facto directors bind the corporation in its dealings with third parties who may not attack the directors' official status. The de facto doctrine, however, does not apply to direct attacks related to the directors authority in internal disputes. *Dillon v. Scotten Dillon Company,* 335 F.Supp. 566, 569–70 (D.Del.1971); *Young v. James,* 34 Del.Ch. 289, 103 A.2d 299 (1954) (class A stockholder may attack status of illegally elected class A directors); *but see Independence Lead Mines Co., supra* at 986 (stockholders who acquiesced in de facto officer's activities may not challenge his official status).

Under the de facto doctrine, even if Overland was not the beneficial owner of the stock, the election and subsequent exercise of directorial duties by the defendants conferred on them de facto status and consequently the corporation is immune from attack by third parties. *See,*

Wolff disputes the finding that Overland used its funds to repurchase the stock. Apparently, when the Bowl subscribers turned in their certificates, they were repaid either from Bowl or Overland funds, though there is no direct evidence of the actual source of repayment.[8] Wolff contends that the defendants did not account for the original $21,600 received from the original subscribers. He points out that the balance sheet of Bowl on June 10, 1958 showed $20,000 cash on hand. He also introduced the balance sheet of Bowl for September 30, 1958 showing assets in excess of $1,000,000, of which only $100 was cash. If the difference in amounts of cash on hand from 1958 to 1959 demonstrates that Bowl itself had repaid its subscribers, then Overland did not have even an equitable interest in Bowl.

Defendants introduced evidence of Bowl's weak financial status. This evidence would support an inference that Bowl lacked the funds to repay its shareholders, and therefore, as defendants have contended, the funds for repayment came from Overland. Metropolitan first became involved in the bowling alley project because the Bowl promoters had been unable to raise sufficient funds through the sale of its stock and through loans. Victor Hart testified that Bowl did not have enough money even to cover the advertising costs for the public sale of Bowl stock. Mr. Patton, one of the original Bowl incorporators, testified that Overland had been covering some of Bowl's debts, because Bowl had run out of money, and that its only asset was the airline hangar itself. He also testified that the Bowl stock was carried as an asset on Overland's books.

■ Our review of the record leads us to the conclusion that the finding that the subscribers were repaid by Overland is not clearly erroneous.[9]

## · III

Wolff also disputes Judge Burke's findings on the costs of construction, which Wolff alleges were inflated.[10] Judge Burke found,

"That from the evidence the court is unable to say that the costs of construction were inflated and that therefore, the Court finds that the plaintiff has failed to support that allegation by a preponderance of the evidence and that the conflicts in the evidence must be resolved in favor of the defendants. . . ."

The original agreement stated that the purchase price, based on construction costs was $575,000. By supplemental agreement the price was increased by $444,750 to reflect the inclusion of the costs of a shopping center located on the same property as the bowling alley.

e.g., *Independence Lead Mines Co., supra.* Whether appellant Wolff would be entitled to attack the defendants' status depends on whether he acquiesced in the activities of the directors. *See In re Bankers Trust, supra* at 21 n. 6; *Independence Lead Mines Co., supra.* However, since we affirm Judge Burke's finding that Overland was the beneficial owner and therefore that the election was proper we need not reach this issue.

8. Neither party introduced evidence of checks of Bowl or Overland made payable to the original subscribers.

9. Rule 52(a) of the Alaska Rules of Civil Procedure sets forth the standard of review which is applicable in reviewing findings of fact. It provides in part:

"Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge of the credibility of the witnesses."

The trial court's decision is entitled to great weight when this court reviews its finding of facts and conclusion of law. An appellant is not entitled to prevail simply because there is some evidence supporting his theory. Nor is the test whether we would decide this case in his favor were we the triers of fact. Rather, we will affirm the trial court unless we are firmly convinced on the basis of the whole record that his decision was clearly mistaken. *Moran v. Holman,* 514 P.2d 817 (Alaska 1973); *Preferred General Agency of Alaska, Inc. v. Raffetto,* 391 P.2d 951, 953 (Alaska 1964); *see Day v. A & G Const. Co., Inc.,* 528 P.2d 440, 447 (Alaska 1974).

10. By the terms of their agreement Metropolitan was to take the bowling alley, pay off an outstanding debt on it, remodel it and then sell it back to Arctic at cost plus 25% as profit. The record indicates that because of Bowl's financial difficulty the profit was actually only 22%.

Appellant Wolff contends that the construction costs were only $205,000. He introduced the pre-trial memorandum from the lawsuit brought by Lee Linck, the architect for the bowling alley project, against Metropolitan. Linck's 6% fee was based on a construction cost of $205,596.15. Wolff also introduced into evidence building permits for the construction. The fees charged in connection with the issuance of these permits were based on proposed construction costs for the bowling alley of $210,000. According to Mr. Cecil Storms, who prepared the estimates for the building permits, the costs on the bowling alley were about $225,000.

Defendants introduced evidence to show that the costs of the project were well above the $210,000 figure. The minutes of a Bowl board meeting held on March 15, 1958 reflect that the costs had been originally estimated at approximately $400,-000.00. Mr. Swanson, Metropolitan's accountant, testified that the figure contained in Linck's pre-trial memorandum was arrived at by subtracting the architect's fee, shopping center costs,[11] land and various other expenses. Moreover, he stated that even the $575,000 contained in the Bowl-Metropolitan agreement was only a beginning figure which did not have much significance because "it was put together as a package, of a bowl building and a shopping center and the construction was contiguous on this and costs were—say continually incurred. . . ."

Mr. Storms testified that the $225,000 figure contained in the applications for building permits covered actual construction costs and did not include "the land, bowling equipment or incidentals that had nothing to do with direct construction."

An independent certified public accountant [12] testified on behalf of defendants that

his firm's audit of Metropolitan's books verified the cost figures. He stated that the figures contained in the original sales agreement and supplement to that agreement were tentative, "subject to adjustment after all of the costs were in, which was a process that took a lot longer than—than the time it took to record [the] contract."

The evidence is in conflict on what the cost estimate was to include. Appellant Wolff contends that it included only the costs of remodeling the hangar itself; hence the $205,000 figure. Appellees contend that it included the price of the land, equipment and foundation costs. Part of the confusion about what construction costs were to be included in the $575,000 sales price arises because the bowling alley and shopping center were built in two stages, with no break between the construction of each stage. Moreover, both structures have a common foundation, and as a result the cost estimate for the bowling alley may have actually included part of the costs of the shopping center.

■■■ The conflicting evidence raises a question of fact properly resolved by the trial court, and we conclude that the findings of fact on this issue are not clearly erroneous. *See* note 9, *supra.*

### IV

Wolff's next point on appeal is that the trial court erred in finding him guilty of laches. He argues that the defendants wilfully and intentionally concealed from him the books of Bowl which contained records of pertinent activities of the defendants from the time of the stockholder's meeting on March 19, 1959, up to the present time. It is his contention that such wilful concealment excuses his delay in bringing suit against the defendants.

11. Mr. Swanson testified that the $575,000 sales price included the foundation of the shopping center, and possibly plumbing and heating work.

12. The CPA, Harney, was independent in the sense he was not a regular employee of Metropolitan. However, he had been hired by Metro-

politan to audit their books for a number of years. Moreover, his testimony indicates he gave financial and business planning advice to Metropolitan with regard to the disposition and acquisition of various assets, including Arctic Bowl.

We articulated the general elements of laches in *Concerned Citizens of So. Kenai Peninsula v. Kenai Peninsula Borough*, 527 P.2d 447, 457 (Alaska 1974):

"The doctrine creates an equitable defense when a party delays asserting a claim for an unconscionable period. A court must find both an *unreasonable delay* in seeking relief and *resulting prejudice* to the defendant. Sustaining this defense requires a decision by the trial court that the equities of the case justify refusal to hear and decide a party's claim. . . . No specific time must elapse before the defense of laches can be raised because the propriety of refusing to hear a claim turns as much upon the gravity of *the prejudice* suffered by the defendant as the *length of a plaintiff's delay.* (emphasis added).

What constitutes an unreasonable delay depends on the facts and circumstances. *Bryan v. Kales*, 134 U.S. 126, 10 S.Ct. 435, 33 L.Ed. 829 (1890). The "essence of laches is not merely [the] lapse of time," but also the lack of diligence in seeking a remedy, or acquiescence in the alleged wrong and prejudice to the defendant. *Southern Pacific Co. v. Bogert*, 250 U.S. 483, 488–89, 39 S.Ct. 533, 536, 63 L.Ed. 1099 (1919) (22 years delay held not to constitute laches). This doctrine bars shareholder suits against corporate directors for breaches of trust where the plaintiff shareholder waits an unreasonable time after gaining knowledge of material facts before seeking relief. *See, e.g., Taylor v. Holmes*, 127 U.S. 489, 8 S.Ct. 1192, 32 L.Ed. 179 (1888).

Where delay is a result of concealment of pertinent facts, courts are less willing to find laches. *See Russell v. Republic Production Co.*, 112 F.2d 663, 666–67 (5th Cir. 1940). This is especially true where the parties seeking to assert laches as a defense are fiduciaries, as are the directors of a corporation. *Pepper v. Litton*, 308 U.S. 295, 306, 60 S.Ct. 238, 84 L.Ed. 281 (1939); *Perlman v. Feldmann*, 219 F.2d 173 (2d Cir. 1955); *see McCandless v. Furlaud*, 296 U.S. 140, 157, 56 S.Ct. 41, 80 L.Ed. 121 (1935). Majority stockholders are also considered fiduciaries with respect to minority stockholders, especially where the majority runs the corporation without giving the minority a voice. *Zahn v. Transamerica Corp.*, 162 F.2d 36, 42 (3rd Cir. 1947); *see Perlman v. Feldmann, supra* at 175. Where a director has affirmatively attempted to conceal his breach of trust from a shareholder, the defense of laches is not available as long as relief is sought within a reasonable time after the breach has been discovered. *Cf. Felix v. Patrick*, 145 U.S. 317, 12 S.Ct. 862, 36 L.Ed. 719 (1892) (reasonable diligence in discovering fraud by trustee required by cestui que trust); *Shew v. Coon Bay Loafers Inc.*, 76 Wash.2d 40, 455 P.2d 359, 365 (1969) (applying principle to joint venturers).

Where a plaintiff seeks to avoid laches on the grounds of concealment it is necessary to set out when "the fraud, mistake, concealment or misrepresentation was discovered, and what the discovery was, so that the court may clearly see whether by ordinary diligence the discovery might not have been before made." *Felix v. Patrick, supra*, 145 U.S. at 332, 12 S.Ct. at 867; *see I–291 Why? Ass'n v. Burns*, 372 F.Supp. 223, 239 (D.Conn.1974); *Ward v. Ackroyd*, 344 F.Supp. 1202, 1212 (D.Md.1972). "The 'unconscionable delay' requisite for successful assertion of the defense of laches 'can only occur after a party discovers or by the exercise of reasonable diligence could have discovered the wrong of which he complains.'" *I–291 Why? Ass'n v. Burns*, 372 F.Supp. 223, 239 (D.Conn.1974); *see Holmberg v. Armbrecht*, 327 U.S. 392, 396, 66 S.Ct. 582, 90 L.Ed. 743 (1946); *Russell v. Republic Production Co.*, 112 F.2d 663, 666–67 (5th Cir. 1940); *Ward v. Ackroyd, supra.* In cases of fraud, delay induced by the fraud has been held not to be laches. *Duniway v. Barton*, 193 Or. 69, 237 P.2d 930, 937 (1951). The test is whether plaintiff moved with reasonable diligence upon discovering the fraud. *Kilbourn v. Sunderland*, 130 U.S. 505, 518–19, 9 S.Ct. 594, 598, 32 L.Ed. 1005, 1010 (1889).

Laches is a question addressed to the discretion of the trial court, and we will

not reverse a finding of laches unless it is clearly erroneous. *Sanuita v. Hedberg,* 404 P.2d 647 (Alaska 1965); *see Concerned Citizens of So. Kenai Peninsula, supra* at 457.

Judge Burke concluded with respect to the March shareholders meeting:

"That the plaintiff is further barred by the affirmative defense of laches raised by the defendants since said events regarding the election of directors and officers occurred in early 1959 and this action was not commenced until September of 1971."

■ The minutes of this meeting show that appellant Wolff was not present. However, the minutes of the December 15, 1960 shareholders meeting at which the directors of Bowl were unanimously re-elected show that Wolff was present at that time. The minutes of the February 26, 1962 shareholders meeting show Wolff was present. According to Victor Hart's testimony at the February 1962 meeting Wolff requested Hart's removal as an officer, and protested his presence at the meeting. Paul Sandifur, Charles Sandifur and Howard Frissel were unanimously elected officers of Bowl with no objection from Wolff. Appellant himself testified at trial that he had been aware of irregularities since 1960. This would mean that more than ten years elapsed from Wolff's discovery of the illegality of the 1959 election to the time that he brought this suit in 1971. Since the officers had been managing the affairs of Bowl during this period of time, Judge Burke was entitled to find that the requisite elements of laches, lack of diligence and prejudice to the defendant, had been met. This finding is not clearly erroneous. Therefore, we affirm the trial court on this issue.

■ As a shareholder, Wolff was under no affirmative duty to discover acts of the directors of Bowl or information revealing that there had been a breach of trust. *See Farwell v. Pyle-National Electric Headlight Co.,* 289 Ill. 157, 124 N.E. 449, 453, 10 A.L.R. 363, 369 (1919). However, once he became aware of facts and circumstances from which knowledge of corporate misconduct

could be imputed to him, a delay in bringing suit could constitute laches. 3 Pomeroy's Equity Jurisprudence § 917 at 598 (5th ed. 1941). The crucial issue is whether Wolff had an opportunity to find out about and did in fact know of the alleged fraudulent misconduct of the officers and directors of Bowl.

Judge Burke's finding of fact on this issue is as follows:

"That on May 1, 1964 the plaintiff Rodney Wolff commenced an action against Arctic in the Superior Court for the State of Alaska, Fourth Judicial District at Fairbanks, No. 64–215, wherein plaintiff requested the court to issue an order for plaintiff to examine the books and records of Arctic. That the file reflects that on October 5, 1964, tax returns, balance sheets and ledger sheets of Arctic were submitted to the plaintiff. That on January 20, 1965, the court records reveal that a memo was filed pursuant to a court order showing that the records had been produced. That on October 5, 1964, [sic; January 20, 1965] there was an order of dismissal showing that books and records had been delivered to the attorney for plaintiff."

From this he concluded:

"Plaintiff's claim against the defendants that they manipulated Arctic Bowl to the detriment of the corporation and to the plaintiff and for the further benefit of Metropolitan Mortgage and Securities Company, Inc. and the defendants Sandifur and others is barred by the doctrine of laches, and the plaintiff shall recover nothing thereon."

Wolff alleged that he was never permitted to see the books and records of Bowl until 1969 when Lee Linck sued Metropolitan for his architects fees. He claimed that he made numerous requests to see the financial statements of Bowl, but admitted that these had been oral requests. He testified that he had known that something was wrong as early as 1960 and did "everything that was humanly possible to do" to ascertain what was the problem with the Bowl books. However, when asked what

lawsuits he had filed, Wolff was very vague as to when these actions were filed, who the attorneys were, or how these actions had been disposed of. He did introduce evidence that a defamation suit brought by Victor Hart against him had been dismissed for failure to comply with a discovery order requiring the production of the Bowl records. *See Hart v. Wolff*, 489 P.2d 114 (Alaska 1971).

Defendants, on the other hand introduced evidence to show that Wolff had been provided with an opportunity to see the books and records of Bowl. Court records show that his May 1, 1964 lawsuit against Bowl was dismissed on the ground that these books and records had been delivered to his attorney. Mr. Miller, an attorney for Bowl, testified that Wolff had appeared at his office and had been provided with the records of Bowl.

In addition to the testimony of Miller there is other evidence that Wolff had been actively objecting to Metropolitan's activities since the early 1960's. This suggests that he did have the opportunity to examine the books and records of Bowl. The record shows that Wolff appeared before a grand jury in Fairbanks [13] and testified that the election of officers was illegal and that there was fraud involved in the "manipulation of stock and the illegal election of officers." Wolff had also written to the Securities and Exchange Commission concerning the misconduct of the officers of Bowl. He may also have written to the Internal Revenue Service and possibly the Federal Bureau of Investigation.

Wolff further asserts that the failure to find him guilty of laches would not result in prejudice to the defendants. *See Concerned Citizens, supra* at 457. However, both the meeting at which the officers of Bowl were elected, and the signing of the contract between Bowl and Metropolitan took place in 1959. The bowling alley was completed soon thereafter, and subsequently sold to the Sandifur brothers. The defendants' interest in having their affairs settled would be prejudiced by allowing suit to be instituted in 1971.

■ Our review of the record leads us to the conclusion that the findings of fact on this issue are not clearly erroneous. *See Concerned Citizens, supra; Sanuita v. Hedberg, supra.* Therefore, we affirm the trial court on this issue.

### V

Appellant Wolff's final point on appeal is that the trial court erred in failing to render a judgment "for an accounting and for an examination and inspection of the books and accounts and records of Arctic Bowl, Inc."

■ The record shows that in 1972 the trial court granted Wolff's motion for an order to compel the officers of Bowl to permit him to inspect the books and records of the corporation. [14] However, this motion did not request an accounting, and there still remains the question whether the trial court erred in failing to render a judgment for an accounting as originally requested in Wolff's amended complaint. Wolff argues that under AS 10.05.246 [15] he was not only

---

13. Wolff alleged that Judge Everett Hepp told the grand jury to drop this matter and that the court had been withholding information from him.

14. Wolff asserts that vital omissions from the records obtained in 1972 have prevented him from accurately assessing the construction costs of the bowling alley. Defendants, on the other hand, argue that since they produced the required documents in May of 1972, further production of documents would require an unnecessary duplication of effort. This clash did not arise as a result of Wolff's assertion of his right as a shareholder to inspect the books and

records of the corporation, but rather as a result of Wolff's attempt to obtain additional discovery. Since we have held that the trial court did not err in vacating its motion for a new trial, it follows that further discovery would be unnecessary. However, as we discuss *infra* at page 770, Wolff is entitled under AS 10.05.246 to inspect the Bowl books and records.

15. AS 10.05.246 provides:
"*Court may compel inspection.* Sections 237–249 of this chapter do not impair the power of a competent court, upon proof by a shareholder of proper purpose, irrespective

entitled to inspect the corporate books and records of Bowl, but was also entitled to an accounting. This section empowers the court to compel the production of corporate books, records and minutes for examination by the shareholders of a corporation. It does not give the court power to compel an accounting. If Wolff is entitled to an accounting, it would be under general equitable principles.

Equity has jurisdiction to compel an accounting where any fiduciary relationship exists. *E.g., Burkey v. American State Bank*, 256 N.W. 300, 302 (Iowa 1934). *Compare Chamberlain v. James*, 294 Mass. 1, 200 N.E. 361 (1936) (accounting inappropriate where no fiduciary relationship shown). As we discussed, *supra* at pages 766, 767 the directors of Bowl stand in a fiduciary relationship to Wolff and therefore would be required to account to ·him for their misconduct. *See Hamilton et al. v. Patrolmen's Benev. Ass'n of City of New York*, 276 App.Div. 863, 93 N.Y.S.2d 220 (1949); *see generally* 9 Fletcher Cyclopedia of the Law of Private Corporations § 4249 (Rev. ed. 1976) *cf. Diamond v. Oreamuno*, 24 N.Y.2d 494, 301 N.Y.S.2d 78, 248 N.E.2d 910 (1969) (insiders who make a profit from use of corporate information must account for profits). *Compare Thomas v. Roblin Industr. Inc.*, 520 F.2d 1393 (3rd Cir. 1975) (no liability where defendant demonstrated he did not profit from any inside information).

Although there is generally jurisdiction over actions for an accounting in both law and equity, *Davis v. Hofer*, 38 Or. 150, 63 P. 56, 57 (1900); II J. Story, *Commentaries on Equity Jurisprudence* § 592 at 10 (4th ed. W. H. Lyon, Jr., 1918), a complaint alleging violations of fiduciary obligations and praying for an accounting is equitable in nature. *Pollitz v. Wabash R.R.*

*Co.*, 207 N.Y. 113, 100 N.E. 721, 723 (1912); II J. Story, *supra* § 598 at 14; *see Hamilton, supra; see also McKinnon v. Morse*, 177 F. 576 (S.D.N.Y.1910).

The exercise of equitable jurisdiction is a matter of discretion for the trial court. *Stone v. Jones*, 66 Cal.App.2d 264,· 152 P.2d 19, 23 (1944); *cf. Pridmore v. Steneck*, 122 N.J.Eq. 35, 191 A. ·861, 862 (1937) (exercise of concurrent jurisdiction also for trial court's discretion).

Since we have affirmed Judge Burke's findings that Wolff was barred from relief by laches, and that there was no breach of fiduciary duty with respect to the sales price for the bowling alley, we further conclude that there was no abuse of discretion in denying Wolff an accounting.[16]

Turning to Mr. Wolff's desire to exercise his right as a shareholder to inspect the Bowl books and records, we think the record amply demonstrates that appellant has shown a "proper purpose" as required by AS 10.05.246. *See e.g., Private Investors v. Homestake Mining Co.*, 16 Cal. App.2d 1, 60 P.2d 146 (1936); *see generally* N. Lattin, *The Law of Corporations* 345 (2d ed. 1971). Therefore, we direct the superior court to enter an order compelling Arctic Bowl to forthwith produce for Mr. Wolff's examination the corporate records obtainable under AS 10.05.246.

AFFIRMED.

ERWIN and BURKE, JJ., not participating.

of the period of time during which the shareholder has been a shareholder of record and irrespective of the number of shares held by him, to compel the production for examination by the shareholder of the books and records of account, minutes, and record of shareholders of the corporation.

**16.** *Cf., Concerned Citizens of So. Kenai Peninsula v. Kenai Pen. Bor.*, 527 P.2d 447, 457

(Alaska 1974) (trial court's discretionary finding of laches will be reversed only where reviewing court has a firm conviction that a mistake has been made); *Gravel v. Alaskan Village Inc.*, 423 P.2d 273, 277 (Alaska 1967) (applying firm conviction of mistake test to court's exercise of discretion in refusing to grant relief from judgment).